**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


DUSTIN P. LIGGITT,              )
                                    )
          Plaintiff,      )      Civil Action No. 10-1024
                                    )
          v.             )      Judge Alan N. Bloch
                                    )      Magistrate Judge Cathy Bissoon
COMMISSIONER OF          )
SOCIAL SECURITY,          )
                                    )
          Defendant.     )


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that the District Court deny Plaintiff's Motion for Summary Judgment (Doc. 10), grant Defendant's Motion for Summary Judgment (Doc. 12), and affirm the decision of the administrative law judge ("ALJ").

## II. REPORT

### A.   BACKGROUND

Dustin P. Liggitt ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381 - 1383f ("Act"). This matter comes before the Court on cross motions for summary judgment. (ECF Nos. 10, 12).

1. *General Background*

Plaintiff filed for SSI and DIB on April 2, 2008, claiming a disability onset date of October 15, 2004.  (R. at 101 – 14).[1]  He was born November 18, 1983, and was twenty-six years of age[2] at the time of his administrative hearing.  (R. at 27).  Plaintiff had completed his high school education, and received a vocational certification in electronics.  (R. at 29).  He later attended college for two years at the Art Institute of Pittsburgh in 2005 and 2006, pursuing a career in photography.  (R. at 27 – 28).

Prior to – and following – his time in college, Plaintiff held a number of temporary and full-time jobs.  In 2002, Plaintiff moved from his parents' home in Salem, Ohio, to Columbus, Ohio, returning to his parent's home in late 2004.  (R. at 275).  Plaintiff arrived in the Pittsburgh area in 2005.  (R. at 27).  In 2005 and 2006, Plaintiff lived with two roommates in Pittsburgh while attending college.  (R. at 27 – 28).  He then moved to Vandergrift, Pennsylvania with his girlfriend.  (R. at 27 – 28).  Plaintiff had returned to Pittsburgh with his girlfriend at the time of his hearing in 2009.  (R. at 27 – 28).

2. *Treatment History*

In December of 2004, Plaintiff first began seeking psychological treatment at the Counseling Center of Columbiana County ("Counseling Center") in Ohio.  (R. at 268).  Over the course of approximately eight therapy sessions ending January 12, 2005, Plaintiff was seen by therapist Karen Arbogast, L.S.W. and psychologist John F. Grzebieniak, Ph.D.  (R. at 268 – 77).  Plaintiff initially presented with concerns about his inability to form and maintain close relationships.  (R. at 268).  He was residing with his parents, and Ms. Arbogast noted that he had a depressed and flat affect.  (R. at 268).  He also was "standoffish and aloof."  (R. at 268).

---

[1]     Citations to ECF Nos. 6 – 6-7, the Record, *hereinafter*, "R. at __."
[2]     Plaintiff is defined as a "Younger Person."  20 C.F.R. §§ 404.1563, 416.963.

It was determined that Plaintiff suffered from social anxiety and depression. (R. at 268 –

77). He explained that, as a result of his anxiety, he sought to avoid contact with strangers in

public, and would do his grocery shopping late at night for this reason. (R. at 268 – 77).

Nonetheless, during his course of treatment at the Counseling Center, Plaintiff also explained

that he would meet people via the internet, and would either invite them to his home or would go

to their homes. (R. at 268 – 77). Plaintiff also would later attest to attending a New Year's Eve

party, where he met someone and played the guitar. (R. at 268 – 77).

With respect to his depression, Plaintiff claimed that it was worst when he lived alone,

and he would often remain inactive for days at a time. (R. at 268 – 77). He generally denied

suicidal ideation, although when he did have such thoughts, he claimed to lack the motivation to

take self-injurious action. (R. at 268 – 77). He described once sitting on the railroad tracks

contemplating whether to jump in front of an oncoming train, but stopping because he did not

want his family to know he committed suicide. (R. at 268 – 77).

On January 5, 2005, Plaintiff met with Dr. Grzebieniak following a Minnesota

Multiphasic Personality Inventory – 2 ("MMPI-2") to discuss the results of the test and undergo

and psychological evaluation. (R. at 275 – 77). Dr. Grzebieniak noted that Plaintiff's

appearance was awkward and unusual, but that he was alert and oriented, his memory was

unimpaired and he exhibited average intellect. (R. at 275 – 77).

Dr. Grzebieniak opined that Plaintiff's claims regarding his inability to interact with other

people were vague, confusing and contradictory. (R. at 275 – 77). Plaintiff did not volunteer

information and responded tersely to the doctor's questions. (R. at 275 – 77).

Questioning elicited frequent "I don't knows." (R. at 275 – 77). Plaintiff seemed "generally

disinterested and intellectually stagnant." (R. at 275 – 77).

Dr. Grzebieniak specifically noted that Plaintiff denied having friends, yet in other contexts mentioned that he had friends and spent time with them. (R. at 275 – 77). Plaintiff also claimed to have a steady girlfriend in high school. (R. at 275 – 77). In addition to Plaintiff's discordant descriptions of his social life, Dr. Grzebieniak found that Plaintiff's descriptions of his moving away from home to live and work uncharacteristic of individuals with social phobias and anxiety. (R. at 275 – 77).

Dr. Grzebieniak noted that the results of personality testing and the MMPI-2 indicated that Plaintiff was not significantly socially limited. (R. at 275 – 77). Moreover, the results of the MMPI-2 led Dr. Grzebieniak to conclude that Plaintiff was malingering – Plaintiff's profile resembled that of an individual asked to "fake bad" on the test. (R. at 275 – 77). Plaintiff also exhibited characteristics of "random responders." (R. at 275 – 77). Plaintiff otherwise was found to have a subtly oppositional temperament, was mildly impulsive, not adaptive, and limited in his insight. (R. at 275 – 77). It was recommended that Plaintiff receive additional counseling, and that he be considered for treatment with medication for obsessive compulsive disorder ("OCD"). (R. at 275 – 77).

Following his evaluation with Dr. Grzebieniak, Plaintiff explained to Mr. Arbogast that he was embarrassed by the results of his testing, and that he was quitting therapy at the Counseling Center because he believed it was not helping him. (R. at 268 – 77). Plaintiff stated that he was looking into beginning college, and that he was hopeful about the future. (R. at 268 – 77).

Treatment records show that Plaintiff did not seek psychological treatment again until June 4, 2007, when he appeared at UPMC Western Psychiatric Institute and Clinic ("UPMC"). (R. at 205). Plaintiff sought treatment for vague complaints of being "depressed" and "upset,"

and because he had vague suicidal ideation. (R. at 205). He claimed he was anxious in social situations, but denied suffering panic attacks. (R. at 205). Plaintiff was noted to be alert, oriented, and well groomed with a somewhat depressed mood, normal speech, linear and organized thought, no suicidal ideation, intact attention and concentration, intact memory, and fair insight and judgment. (R. at 208). He was diagnosed with major depressive disorder and obsessive compulsive disorder, and was given a global assessment of functioning[3] ("GAF") score of 40. (R. at 208). Plaintiff was recommended for outpatient care and was not considered to be a danger to himself. (R. at 394).

Following his first evaluation at UPMC, Plaintiff began individual and group therapy that continued through November of 2007. (R. at 345 – 50). Initially, Plaintiff denied suicidal ideation, but admitted to some self-injurious behavior to distract himself from his distress. (R. at 391). Plaintiff described obsessively checking the time, and spending a great deal of time ruminating about personal worries. (R. at 385, 387, 391). Otherwise, Plaintiff was quiet and answered questions about his symptoms only vaguely. (R. at 389, 391). He was not experiencing sleep or appetite disturbances. (R. at 391).

---

[3] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). A GAF score of 60 reflects "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" a score of 50, "[s]erious symptoms (*e.g.*, suicidal ideation ....)" or "impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job);" a score of 40, "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; a score of 30, behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (*e.g.*, ... suicidal preoccupation)" or "inability to function in almost all areas ..."; and a score of 20 or lower, "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

As treatment progressed, however, – particularly group therapy – Plaintiff was always noted as arriving on-time and participating actively. (R. at 345 − 50, 353 − 92). He also was noted as being attentive and cooperative in group therapy, and was increasingly willing to openly discuss personal issues. (R. at 345 − 50, 353 − 92). Plaintiff was considered to be a "leader" in his support group. (R. at 369). He also found himself able to let go of his ruminating habit, practice with his band and perform once a month, run errands, drive friends to different places and attend a party. (R. at 345 − 50, 353 − 92). He did begin to complain of sleepiness and lack of motivation during the day. (R. at 367, 373). Yet, he also stated that he slept well at night, and his sleep was noted to be improving. (R. at 360, 371). Plaintiff reported increased struggles with groups of people, but these complaints corresponded with an increase in social activity. (R. at 354, 363).

On the whole, Plaintiff reported increased social interaction and a lessening of anxiety. (R. at 345 − 50, 353 − 92). Plaintiff provided feedback in group therapy that was both accurate and insightful. (R. at 370). By July of 2007, Plaintiff exhibited significant positive changes. (R. at 355, 360, 366). Although Plaintiff originally claimed that he avoided social interaction and conflict, he had begun to exhibit an increased willingness to challenge others in group therapy in a positive way. (R. at 364). His obsessive behavior also lessened. (R. at 360). Plaintiff kept busy and accomplished tasks using distress tolerance skills. (R. at 358).

In individual therapy, it often was noted that Plaintiff's greatest stressors were his relationships and living arrangements. (R. at 345 − 50, 353 − 92). Plaintiff denied suicidal ideation. (R. at 345 − 50, 353 − 92). He did mention that he felt flat, and that the tension and volatility in his relationship with his live-in girlfriend was emotionally draining. (R. at 345 − 50,

353 – 92).   However, Plaintiff reported feeling improvement in his mood, and feeling more focused and capable, more energetic and "different" in a positive way.  (R. at 353).

Upon discharge from the treatment program at UPMC in November of 2007, Plaintiff was evaluated by Alex Strauss, M.D.  (R. at 345 – 50).   Plaintiff reported doing "very well" on his dosage of twenty milligrams of Prozac and two hundred milligrams of Wellbutrin, and was without depression and suicidal thinking.  (R. at 345, 349).   He reported being well rested with no concentration difficulties, no decreased energy and no psychomotor retardation. (R. at 345).   He was noted as being the leader of his band.  (R. at 345).   Dr. Strauss found Plaintiff to be alert, cooperative, clean and casually dressed.  (R. at 347).   Plaintiff had normal speech, good mood, congruent and reactive affect, intact memory, intact concentration and attention, logical and goal oriented thought, no suicidal ideation or self-injurious behavior, fair insight and judgment and baseline cognitive functions without deficits.   (R. at 347). Plaintiff was diagnosed with major depressive disorder and social phobia, and was given a GAF score of 70.  (R. at 347, 349).

Plaintiff transitioned into psychiatric treatment at Mercy Behavioral Health in Pittsburgh in October of 2007.  (R. at 225).   In Plaintiff's initial evaluations, Raymon Pan, M.D. noted that Plaintiff felt "okay," was without suicidal ideation, exhibited a good mood, and was "doing well," although he provided conflicting reports about the quality of his sleep.  (R. at 225, 228). Plaintiff complained of no side effects from his prescription medications, Prozac and Wellbutrin. (R. at 225, 228).

In Plaintiff's early individual therapy sessions, Plaintiff explained that he wished to work on his anxiety and depression.  (R. at 230).   He indicated that he suffered from a history of depression, but was guarded and had difficulty explaining his symptoms to his therapist.

(R. at 230 – 31). Eventually, Plaintiff began to claim that he had difficulty with social contact and felt that life was meaningless. (R. at 232). He claimed to lack motivation. (R. at 233).

Plaintiff once mentioned to his therapist on January 2, 2008 that he isolated himself in his apartment that weekend because of his depression and social anxiety. (R. at 234). However, just prior to that weekend, Plaintiff had traveled to visit his parents and family in Ohio, and went to work. (R. at 234). Just following that weekend, Plaintiff planned a trip to Los Angeles with a friend and felt better after having done so. (R. at 234). During the same period, he also refused to increase his medication dosage because he did not want his medications to become a "crutch." (R. at 235).

Further into his treatment, Plaintiff would explain that his social anxiety did not limit him, and that he did not experience the anxiety if he avoided certain social activities. (R. at 289, 291). He also reported "minimal" depressive symptoms, and was excited about traveling with friends. (R. at 290). In treatment notes, his depression and anxiety were noted as being only "mild" and his mood was showing improvement. (R. at 236). Moreover, Plaintiff's later claims of difficulty leaving his home conflicted with contemporaneous reports of his interactions with friends and others – including visits to Los Angeles and Las Vegas, regularly talking to friends on the phone, attending practices with his band and having a live-in girlfriend. (R. at 221 – 24, 230 – 41, 283, 289 – 97, 299 – 340). Plaintiff was noted as having little desire to change his lifestyle. (R. at 292). He did not want to work on increasing his tolerance for contact with people. (R. at 301).

Plaintiff's psychological state only continued to improve during his time in individual treatment, his mood being noted as stable or good, his depression as minimal, and his anxiety as minimal. (R. at 237). He typically exhibited no suicidal ideation or self-injurious behavior.

(R. at 221 – 24, 230 – 41, 283, 289 – 97, 299 – 340).  Plaintiff would sometimes state that he did not leave his house, even when generally admitting to continually lessening social anxiety and to venturing out of his home at least once per day.  (R. at 221 – 24, 230 – 41, 283, 289 – 97, 299 – 340).  Plaintiff looked for employment, but sought jobs that had no set hours, could be done at home, and did not involve contact with people.  (R. at 301).  Plaintiff was willing to live without money in lieu of finding such a job.  (R. at 301).

Over the course of his individual therapy at Mercy Behavioral Health, Plaintiff's therapists assessed approximately one GAF score of 40, four GAF scores of 45, ten GAF scores of 50, and three GAF scores of 55.  (R. at 221 – 24, 230 – 41, 283, 289 – 97, 299 – 340).  Yet no explanations for these scores were provided, and no attempt was made to reconcile Plaintiff's often conflicting reports of his activities and psychological limitations.  (R. at 221 – 24, 230 – 41, 283, 289 – 97, 299 – 340).  Plaintiff's last recorded individual therapy session at Mercy Behavioral Health was in September of 2009.  (R. at 221 – 24, 230 – 41, 283, 289 – 97, 299 – 340).

In an assessment conducted at Mercy Behavioral Health in August of 2008, Plaintiff reported no complaints or stressors, was alert and oriented, and had a stable mood, had organized, appropriate, and connected thought processes, had normal motor behavior, normal speech, normal sleep, appetite, and energy, and had no suicidal ideation.  (R. at 309).  He also reported no medication side effects.  (R. at 309).  Subsequent psychological assessments yielded nearly identical results, indicating that his anxiety and depression were under control.  (R. at 221 – 24, 230 – 41, 283, 289 – 97, 299 – 340).

3. *Functional Limitation Assessments*

Lawrence P. Haddad, Ph.D. performed a consultative examination of Plaintiff for the Bureau of Disability Determination of June 3, 2008. (R. at 242 – 48). Dr. Haddad observed Plaintiff to be subdued, tense, anxious, socially withdrawn, and unable to provide detail regarding his psychological symptoms. (R. at 242 – 48). He was dressed appropriately and his hygiene was adequate. (R. at 242 – 48). Plaintiff also was fully cooperative. (R. at 242 – 48). Plaintiff reported to Dr. Haddad that he felt incapable of working due to anxiety, depression and significant sleep disturbance. (R. at 242 – 48).

Dr. Haddad found Plaintiff's speech to be adequate, his affect to be restricted, his mood dysphoric, his thought processes adequate and without disruption or impairment, his intellect intact, his fund of knowledge good, his planning and judgment unimpaired, his concentration and attention moderately impaired, his memories intact, and his impulse control good. (R. at 242 – 48). Plaintiff was alert and oriented. (R. at 242 – 48). Dr. Haddad noted that Plaintiff explained having suicidal thoughts in the past, but was able to now keep them under control. (R. at 242 – 48).

Dr. Haddad concluded that Plaintiff suffered long-term, mild depression and marked anxiety. (R. at 242 – 48). Plaintiff's prognosis was guarded, but he was found capable of cleaning and maintaining his apartment, shopping for and preparing meals, driving, handling personal finances, and maintaining personal hygiene. (R. at 242 – 48). Plaintiff was capable of getting along with others but would have some marked difficulty interacting with the public. (R. at 242 – 48). He could carry out only simple instructions and make only simple decisions. (R. at 242 – 48). Plaintiff would have marked limitation responding appropriately to work

pressures in a usual work setting. (R. at 242 – 48). In all other respects, however, Plaintiff would be only slightly or moderately functionally limited. (R. at 242 – 48).

On June 6, 2008, John Rohar, Ph.D. performed a residual functional capacity ("RFC") assessment of Plaintiff based upon his medical record. (R. at 249 – 52). Plaintiff was determined to be markedly limited in his ability to interact appropriately with the general public, but was otherwise only moderately or not significantly limited in his functioning. (R. at 249 – 52). Dr. Rohar concluded that Plaintiff would be capable of maintaining substantial gainful employment on a full-time basis despite his limitations. (R. at 249 – 52). Dr. Rohar felt that Dr. Haddad's findings overestimated the severity of Plaintiff's functional limitation. (R. at 249 – 52).

### 4. *Administrative Hearing*

Plaintiff testified that his past employment experience included a stint as a Dell computer monitor repair technician from 2002 until 2003. (R. at 29). He also worked temporary jobs in maintenance and wiring orders for a month in 2003. (R. at 29 – 30). He worked a temporary job as a printer repairman for about a month in 2004. (R. at 30). Plaintiff was working full-time as a television cable installer in June and July of 2003, but he quit that position because working in other people's houses gave him anxiety. (R. at 30). Plaintiff stated that he was not on any medication while at that job. (R. at 30).

Plaintiff's last full-time job was in data security. (R. at 29 – 30). Plaintiff quit that job after a month, but did not provide a reason. (R. at 31). Plaintiff worked temporary positions in 2007, setting up tables and chairs. (R. at 31). In 2008, he worked for a few weeks installing computers in local schools. (R. at 31). Plaintiff has not worked since. (R. at 31).

Plaintiff claimed that he subsisted on public assistance, his girlfriend's income, and income from the sale of his personal belongings. (R. at 32).

When asked why he left the Art Institute after two years of schooling, Plaintiff had difficulty explaining the reasons, stating: "I don't know. I feel like I couldn't really do it anymore." (R. at 28). Plaintiff continued, stating that his studies had become more difficult, and he was having trouble being around other people. (R. at 28).

Plaintiff sought treatment at UPMC in 2007 following claimed suicidal ideation. (R. at 28, 38). Plaintiff later sought treatment with Mercy Behavioral Health, and had continued with once-a-month treatment sessions at the time of the hearing. (R. at 29). He testified that he was on medication – taking three hundred milligrams of Wellbutrin and twenty milligrams of Prozac. (R. at 32 – 33). The medications allegedly provided only incomplete relief from Plaintiff's anxiety. (R. at 33 – 34). His suicidal ideation had decreased significantly since beginning treatment. (R. at 38 – 39). He claimed to have suffered from anxiety beginning in junior high and high school. (R. at 35). The anxiety allegedly brought about two or three migraines a week. (R. at 38). It was often difficult for Plaintiff to focus or concentrate as a result. (R. at 38).

Plaintiff denied suffering from OCD related symptomology, and believed that his primary issues were depression and anxiety. (R. at 35). Stress and an atypical sleep schedule were the main reasons Plaintiff claimed he was unable to hold a full time job. (R. at 38). There was no set schedule to Plaintiff's day – he slept for approximately four hours at any given time, went about his daily activities when he awoke, and then returned to sleep for another four hours, only to repeat the process again throughout the day. (R. at 36 – 37).

Plaintiff explained that he only knew a few people, and did not spend any significant time with anyone other than his girlfriend. (R. at 34). He only spent time with his family once every few months. (R. at 34). Plaintiff acknowledged playing the guitar in a band, although he claimed only to play with the band every once in a while, and that the band had not played in public for a couple of years. (R. at 34 – 35). The members constituting the band were Plaintiff's friends. (R. at 34). Plaintiff composed music on his computer and interacted via email with his band mates to develop recorded music. (R. at 35).

Plaintiff owned and cared for two dogs and an aquarium. (R. at 35). He was capable of driving a car and shopping on his own. (R. at 37 – 38). Plaintiff alleged that he only went shopping very early in the morning in order to avoid people. (R. at 38). He also claimed that in an average week he did not leave his house three to four days. (R. at 39).

Following Plaintiff's testimony, the ALJ asked the vocational expert what jobs would be available to a hypothetical person of the same age, education level, and work experience as Plaintiff, but limited to simple instructions and simple decision making, and not requiring close coordination with or proximity to others, face to face interaction with the general public or groups of people, and no assembly line work pace. (R. at 40 – 41). The vocational expert responded that at the medium exertional level, the hypothetical person would be able to work as a "hand packer," with over 800,000 positions available in the national economy. (R. at 40 – 41). At the light exertional level, the hypothetical person would be capable of working as a "cleaner," with over one million positions available. (R. at 40).

The ALJ then inquired as to whether the above mentioned jobs would still be available if the person would miss three days of work a month due to anxiety. (R. at 41). The vocational expert testified that no jobs would be available to such a person. (R. at 41). Plaintiff's attorney

followed up by asking whether the above mentioned jobs would be available if the hypothetical person was off task twenty percent or more of any given workday. (R. at 41). The vocational expert replied that no jobs would be available to such a person. (R. at 41).

**B.  ANALYSIS**

1. *Standard of Review*

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[4] and 1383(c)(3).[5] Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. § 706. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion.

---

[4]     Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5]     Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

*Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). In short, a court can only test the adequacy of an ALJ's decision based upon the rationale provided by the ALJ. A court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion, . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant currently is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is "severe"; (3) whether the medical evidence of the claimant's impairment or

combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

2. *Discussion*

In his decision, the ALJ found Plaintiff to be capable of performing a full range of work, but limited to:  simple instructions and no more than simple decision making; no work requiring close proximity to others, face to face interaction with the public, or working with groups of people; and no work requiring an assembly line pace.  (R. at 15).  In conformity with the testimony of the vocational expert at Plaintiff's administrative hearing, the ALJ determined that Plaintiff was capable of performing jobs existing in significant numbers in the national economy. (R. at 17).  As a result, Plaintiff was found ineligible for DIB or SSI.  (R. at 17 – 18).

In short, Plaintiff makes the following objections to the decision of the ALJ:  the ALJ erred in failing to accord proper weight to Plaintiff's treating psychiatrist, "Dr. Blaize," at Mercy Behavioral Health; the ALJ erred in failing to discuss any of Plaintiff's GAF scores between 40 and 50; the ALJ erred in failing to explicitly adopt all of the findings of the consultative examiner, Dr. Haddad; the ALJ misconstrued Plaintiff's activities of daily living to discredit his

allegations of disability; and, as a result of the aforementioned errors, the ALJ's RFC assessment and hypothetical questions to the vocational expert were improper. (ECF No. 11 at 13 – 26).

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). Although the ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, he or she must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000)); *Cotter*, 642 F.2d at 706). In the present case, the ALJ adequately met his responsibilities under the law.

Plaintiff first argues that the ALJ failed to consider the medical opinions of "Dr. Blaize," which purportedly support a finding of disability. (ECF No. 11 at 14). With respect to treating physicians, the Court of Appeals for the Third Circuit has held that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.* Further, the determination of disability status for purposes of receiving benefits – a decision reserved for the

Commissioner – will not be affected by a medical source simply because it states that a claimant is "disabled" or "unable to work." 20 C.F.R. §§ 404.1527(e), 416.927(e).

Unfortunately, the only doctor Plaintiff alleges that the ALJ failed to properly consider – "Dr. Blaize" – was not, in fact, a doctor. Further, a reading of the factual record and the ALJ's determination evinces that the ALJ considered nurse practitioner Leslee J. Blaze's medical findings. (R. at 236 - 39, 283, 306, 309 – 11, 317 – 18, 323 – 24, 329, 334, 336). As the ALJ noted, Ms. Blaze found during her treatment sessions that Plaintiff suffered no episodes of decompensation, was able to control and improve his depression and anxiety with medication, and typically reported no medication side effects. (R. at 14 – 16, 236 - 39, 283, 306, 309 – 11, 317 – 18, 323 – 24, 329, 334, 336). Moreover – and with increasing frequency as therapy with Ms. Blaze progressed – Plaintiff was found to experience more "good" days, exhibited no suicidal ideation or self-injurious behavior, noted increased energy, good mood, connected, organized, and appropriate thought processes, normal speech, normal motor behavior, and no sleep disturbance. (R. at 236 - 39, 283, 306, 309 – 11, 317 – 18, 323 – 24, 329, 334, 336). Even if Ms. Blaze were a treating physician and her opinion were entitled to substantial weight, Plaintiff fails to explain how Ms. Blaze's findings contradict those of the ALJ.

Plaintiff likewise fails to identify which of the findings of any of Plaintiff's other treating physicians supported a conclusion that Plaintiff was incapable of engaging in substantial gainful employment on a full-time basis, and further fails to acknowledge that none of the doctors or other of Plaintiff's treating sources made specific findings illustrating functional limitations consistent with Plaintiff's subjective complaints. Dr. Grzebieniak opined – based upon objective medical testing – that Plaintiff's subjective complaints were more akin to malingering than to actual organic disorder. (R. at 275 – 77). Following discharge from treatment at UPMC,

Dr. Strauss felt that Plaintiff's psychological state had improved to the point that he gave Plaintiff a GAF score of 70. (R. at 345 – 50). Plaintiff was doing "very well," and his psychological condition was well-controlled. (R. at 345 – 50). Finally, while at Mercy Behavioral Health, Dr. Pan found Plaintiff to be doing well, with a good mood and no complaints, without medication side effects and suicidal ideation, and denying depression. (R. at 225, 228). Plaintiff does not identify findings by any of his doctors that contradict the findings of the ALJ.

Plaintiff next argues that the ALJ erred in failing to explicitly cite to numerous GAF scores ranging between 40 and 50[6] in his decision. (ECF No. 11 at 18 – 21). The Court of Appeals for the Third Circuit has held that a "GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings." *Gilroy v. Astrue,* 351 Fed. Appx. 714, 715 – 16 (3d Cir. 2009) (citing 66 Fed. Reg. 50764-5 (2000)). Still, it has been recognized that GAF scores can indicate an individual's capacity to work; however, GAF scores have been noted to correspond to factors unrelated to the ability to work full time, and absent evidence that a GAF score was meant to indicate an impairment of the ability to work, a GAF score does not establish disability. *Coy v. Astrue*, 2009 WL 2043491, *14 (W.D. Pa. Jul. 8, 2009) (citing *Chanbunmy v. Astrue*, 560 F.Supp.2d 371, 383 (E.D. Pa. 2008)).

There is no requirement that the ALJ mention GAF scores with specificity in his or her discussion, and an ALJ's failure to include a GAF score in his or her discussion is inconsequential where a claimant has not explained how the GAF score would have itself satisfied the requirements for disability in light of potentially contradictory evidence on record.

---

[6]     Parenthetically, the Court of Appeals for the Third Circuit has held that a GAF score of 50 indicates that a claimant can perform some substantial gainful activity. *Hillman v. Barnhart*, 48 Fed. Appx. 26, 29 n 1 (3d Cir. 2002). A significant majority of Plaintiff's GAF scores were 50 and above. *See* discussion *supra*.

*Coy*, 2009 WL 2043491 at \*14; *Rios v. Astrue*, 2010 WL 3860458 at \*8 (E.D. Pa. 2010) (citing *Purnell v. Astrue*, 662 F.Supp.2d 402, 415 (E.D. Pa. 2009)). Further, where a treating source has failed to provide specific limitations findings to explain a given GAF score, or to tie the GAF score into some explanation of a claimant's ability to work, the Court of Appeals for the Third Circuit has held that a court cannot be expected to provide a specific assessment of the GAF score. *Gilroy*, 351 Fed. Appx. at 716.

Additionally, an ALJ is entitled to overlook evidence that is not probative. *Hendrickson v. Astrue*, 2008 WL 3539621, \*4 (E.D. Pa. August 11, 2008) (citing *Johnson*, 529 F.3d at 204). "The probative value of evidence may be discounted and rendered irrelevant where there is [o]verwhelming evidence to the contrary in the record." *Id.* (internal quotations omitted). It may be inferred that the ALJ has implicitly rejected such evidence where not specifically discussed. *Id.* It follows that "failure to cite specific evidence does not establish that the ALJ failed to consider it." *Phillips v. Barnhart*, 91 Fed. Appx. 775, 780 n 7 (3d Cir. 2004); *see also Hur v. Barnhart*, 94 Fed. Appx. 130, 133 (3d Cir. 2004).

In the present case, Plaintiff's treating sources failed to discuss – in any manner – the reasons for assessing the GAF scores found on some of their reports. *See Coy*, 2009 WL 2043491 at \*14 (quoting *Chanbunmy*, 560 F.Supp.2d at 383 ("A GAF score, without evidence that it impaired the ability to work, does not establish an impairment.")); *see also Gilroy*, 351 Fed. Appx. at 716 (The ALJ was not found to have erred when omitting a GAF score where the doctor in question did not make specific limitations findings or otherwise explain the basis for the GAF score.).[7] As discussed by the ALJ, the specific findings in the Mercy Behavioral

---

[7]     Similar to the case in *Gilroy*, no explanation of GAF scores was provided by Plaintiff's treating sources here, and the ALJ did not make a finding that conflicted with GAF scores ranging from 40 – 50 when he acknowledged that Plaintiff's psychological state required him to

Health reports with and without GAF scores do not suggest a level of functional limitation as severe as Plaintiff alleges. Indeed, as also is pointed out by the ALJ, Plaintiff's own reports of his activities, and his frequently contradictory reports regarding his mental state, belie his assertion of disabling functional limitations. Similar to the case in *Phillips*, the notes of Plaintiff's treating sources do not contain any findings of work-related limitations, the clinical findings do not indicate Plaintiff was disabled, and the ALJ indicated that he gave consideration to these sources. *See Phillips*, 91 Fed. Appx. at 780 – 81. The ALJ's thorough accounts of Plaintiff's personal activities and his finding that the reports often contained contradictory and conflicting accounts by Plaintiff were clearly gleaned from a review of Plaintiff's treatment notes spanning a number of years. (R. at 14 – 16). Plaintiff's argument regarding GAF scores is unpersuasive.

Plaintiff next argues that the ALJ erred when stating that his RFC assessment was consistent with the findings of consultative examiner Haddad. (ECF No. 11 at 22). Dr. Haddad concluded in his evaluation of Plaintiff's functional limitations that Plaintiff would have marked difficulty responding to work pressures in the usual work setting. (R. at 247). It is Plaintiff's contention that the ALJ was required to adopt this exact statement into his RFC assessment and hypothetical question(s) to the vocational expert. However, the ALJ's RFC assessment clearly indicated that Plaintiff could not be required to do more than follow simple work instructions, make more than simple decisions, or work a normal assembly line pace. (R. at 15). Plaintiff also

---

avoid working face to face or in close proximity with other people, groups of people, and the general public. (R. at 15). *See Gilroy*, 351 Fed. Appx. at 716. It also should be noted that the only GAF score assigned by one of Plaintiff's physicians – Dr. Strauss – was a score of 70, which Plaintiff fails to address in his brief, along with the scores of 55 assessed while Plaintiff was at Mercy Behavioral Health. This is not a case where the ALJ merely cherry picked evidence to bolster a conclusion – he also omitted discussion of the higher scores. *Cf. Bonani v. Astrue*, 2010 WL 5481551, *8 (W.D. Pa. Oct. 15, 2010).

was to avoid face to face interaction with the public or close proximity to others in the workplace, and to avoid groups of people. (R. at 15). All of these limitations were consistent with Dr. Haddad's findings. (R. at 242 – 48).

Further, all of these limitations were clearly aimed at reducing the stress Plaintiff claimed to suffer as a result of social anxiety, depression, and an inability to concentrate or maintain attention. Plaintiff fails to explain how the ALJ's accommodations were not sufficient to address the finding that Plaintiff would have marked difficulty with work pressures in a usual setting. A limitation finding need not be recited verbatim in an ALJ's hypothetical or RFC assessment; the ALJ is only required to adequately convey a claimant's impairments and the limitations caused. *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004). The ALJ his fulfilled his duty in this respect, and Plaintiff's argument is unavailing.

Plaintiff next objects that Plaintiff's activities of daily living were more limited than those described in the ALJ's decision. (ECF No. 11 at 23). Activities of daily living are relevant to a claimant's functional capacity and credibility. *See Russo v. Astrue*, 2011 WL 1289132 at * 4 – 5 (3d Cir. 2011); *Burns v. Barnhart*, 312 F.3d 113, 129 – 30 (3d Cir. 2002); *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999); 20 C.F.R. §§ 404.1529, 416.929. The ALJ, therefore, has a responsibility to portray these activities accurately.

Plaintiff lists several instances wherein it is alleged that the ALJ significantly misconstrued Plaintiff's daily functioning. (ECF No. 11 at 23). The examples provided create an illusion that Plaintiff's allegations of suicidal ideation, social anxiety, and resultant isolation were more severe than indicated by the ALJ in his discussion. (*Id.*). Although Plaintiff claims his psychological issues worsened over time, this simply is not the case. *See* discussions *supra*. Plaintiff's argument, therefore, fails.

In light of the discussions above, the Court also finds that Plaintiff's arguments regarding the propriety of the ALJ's RFC assessment and hypothetical questions to the vocational expert lack merit. The ALJ's determination was supported by substantial evidence.

## C.    CONCLUSION

The ALJ provided sufficient justification from the medical record and Plaintiff's personal testimony to allow this Court to conclude that substantial evidence supported his decision. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (Doc. 10) be denied, Defendant's Motion for Summary Judgment (Doc. 12) be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrates Act, 20 U.S.C. § 636(b)(1) (B) and (C), and Rule 72.D.2 of the Local Rules for Magistrates, objections to this Report and Recommendation must be filed by June 6, 2011. Failure to file objections will waive the right to appeal. Brightwell v. Lehman, -- F.3d --, 2011 WL 635274, *5 n.7 (3d Cir. Feb. 9, 2011). Responses to objections are due by June 23, 2011.


May 20, 2011                                         *s/ Cathy Bissoon*
                                                    Cathy Bissoon
                                                    United States Magistrate Judge

cc (via ECF email notification):

All Counsel of Record